## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

-------------------------------------------------------------

JOHN DOE,                                    Civ. No. 6:16-cv-2232-Orl-37KRS

               **Plaintiff,**                   **AMENDED**
                                                 **COMPLAINT**

v.

ROLLINS COLLEGE, JESSICA NARDUCCI,           **JURY TRIAL**
ORIANA JIMINEZ, KEN MILLER, REBECCA          **DEMANDED**
DECESARE, MEGHAN HARTE WEYANT,

               **Defendants.**
-------------------------------------------------------------

### AMENDED COMPLAINT

Plaintiff (hereinafter referred to as "Plaintiff" or "John Doe") by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

### The Nature of this Action

1.   This case arises out of the actions taken and procedures employed by Defendant Rollins College ("Rollins" or the "College"), Defendant Jessica Narducci ("Defendant Narducci"), Defendant Oriana Jimenez ("Defendant Jimenez"), Defendant Ken Miller ("Defendant Miller"), Defendant Rebecca DeCesare ("Defendant DeCesare"), and Defendant Meghan Harte Weyant ("Defendant Weyant") (collectively, "Defendants") as a result of false allegations that Plaintiff, a male student at Rollins, engaged in nonconsensual sexual activity with a fellow Rollins student ("Jane Doe" or the "Complainant") during his freshman year at the College.

2.    Plaintiff John Doe[1] seeks relief against Rollins following Rollins' wrongful and unjustified imposition of sanctions based on a fellow Rollins student's false and unproven allegations of sexual misconduct, as well as Rollins' failure and refusal to investigate or report John Doe's own allegations of sexual misconduct. This injustice was the direct result of Rollins' failure to (1) conduct an adequate investigation, (2) provide Plaintiff with due process as defined by Rollins' own policies, and (3) excessive focus on the concerns and interests of the female complainant and the convenience of the College to the total exclusion of the rights and interests of the male respondent Plaintiff.

3.    Rollins' precipitous and unjustified actions violated its contract with John Doe, the applicable standard of care under State law and the requirements of Title IX of the Education Amendments of 1972.

4.    Rollins' arbitrary and capricious findings and action have derailed John Doe's education, tarnished his reputation and permanently damaged his future career and educational prospects.

## The Parties

5.    Plaintiff is a natural person, citizen of the United States and resident of the state of New York.  During the events described herein, Plaintiff was a student at Rollins College and resided in the College's dormitory in Winter Park, Florida.

6.    Upon information and belief, Rollins College is a private, co-educational university, which receives federal funding. It is located in Winter Park, Florida.

7.    Upon information and belief, Defendant Jessica Narducci is a resident of the State of Florida and was the Investigator retained by Rollins at all relevant times herein.

---

[1]  Plaintiff will file forthwith a motion for leave to use pseudonyms addressing the issues raised in the Court's order dismissing the Plaintiff's previous request to proceed under a pseudonym. (*See* Doc. 6).

8.     Upon information and belief, Defendant Oriana Jimenez is a resident of the State of Florida and was Rollins Title IX Coordinator at all relevant times herein.

9.     Upon information and belief, Defendant Ken Miller is a resident of Florida and was Assistant Vice President of Public Safety at all relevant times herein.

10.   Upon information and belief, Defendant Rebecca DeCesare is a resident of Florida and was the Dispatch Officer in the Rollins Campus Safety Department at all relevant times herein.

11.   Upon information and belief, Defendant Meghan Harte Weyant is a resident of Florida and was Dean of Students at all relevant times herein.

12.   Plaintiff and Defendant Rollins College, Defendant Narducci, Defendant Jimenez, Defendant Miller, Defendant DeCesare, and Defendant Weyant are sometimes hereinafter collectively referred to as the "Parties."

## Jurisdiction and Venue

13.   This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) John Doe and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14.   This Court has personal jurisdiction over Rollins on the grounds that Rollins is conducting business within the State of Florida.

15.   Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.   On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. Russlynn Ali, Offc. for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ("Dear Colleague Letter").

17.   The Dear Colleague Letter echoes the mandates of President Obama's Administration that colleges like Rollins equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

18.   In order to provide females preferential treatment, the Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves.   For example, the Dear Colleague Letter required schools to adopt the lowest burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. The Dear Colleague Letter also mandated schools "minimize the burden on the complainant." *Dear Colleague Letter* at 15–16.

19.   The commencement of OCR investigations across the country put immediate and tremendous pressure upon all colleges and universities to: (a) aggressively prosecute males accused of sexual misconduct; (b) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence; and (c)

equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

20.   OCR also put pressure on colleges and universities to apply a preponderance of the evidence standard, which makes it easier to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

21. Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at Rollins caused Rollins to apply its Title IX policies in an unlawful and gender-biased manner against John Doe. Evidence of Rollins' gender bias includes, but is not limited to, the fact that Rollins is prosecuting Jane Doe's January 2016 Title IX complaint against John Doe, while rejecting: (a) John Doe's January 2016 Title IX complaint against Jane Doe; and (b) John Doe's complaint that Jane Doe's January 2016 Title IX complaint is false, unsupported, and was made in bad faith.

22. Rollins also failed to comply with OCR's guidance regarding the credibility of the parties and the presence of corroborating evidence.   *See generally,* Offc. Civil Rights, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/shguide.html ("OCR's Sexual Harassment Guide").

23. Further, DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a

university did not do enough to discipline male students alleged to have engaged in sexual misconduct with female students. Accordingly, OCR's investigations put millions of dollars in federal student aid at risk.

24.     For Rollins, which was not under investigation by OCR, the threat of such an investigation and the possible withdrawal of federal funding would be catastrophic. Upon information and belief, Rollins received millions of dollars in government grants and contracts for the years 2014 and 2015. *See* Rollins College, *Consolidated Financial Statements Years Ended May 31, 2015* (2015), *available at* http://www.rollins.edu/finance/documents/financial-information/audited-financial-statement-fy15.pdf.

25.  Rollins engaged in the gender-biased behavior and/or Title IX retaliation detailed in this Complaint in part because of fear of the threat of an OCR investigation and loss of federal funding. Evidence supporting this belief includes The White House's April 2014 report entitled "Not Alone" which threatens the elimination of federal funds by stating: "[i]f OCR finds a Title IX violation, the school risks losing federal funds."  Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault at 2 (2014), https://www.whitehouse.gov/sites/default/files/docs/report_0.pdf ("Not Alone Report").

26.  The DOE/OCR federal funding threats dovetail with the Administration's "It's On Us" campaign that states: "[a]n estimated one in five women has been sexually assaulted during her college years." https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus (last visited Sept. 12, 2016); https://www.whitehouse.gov/the-press-

office/2014/04/29/fact-sheet-not-alone-protecting-  students-sexual-assault  (last  visited

Sept. 12, 2016).

27.    However,  the  Obama  Administration's  allegations  that  20%  of

America's  female  college  students  are  being  sexually  assaulted  by  their  male

counterparts is false. For example, over 90% of the colleges and universities in the

United States reported *none* of their students were raped in 2014. *See* American Assoc.

of Univ. Women, *91 Percent of Colleges Reporterd Zero Incidents of Rape in 2014*

(Nov. 23, 2015), http://auw.org/article/clery-act-data-analysis/ (last visited 9/19/16).

28.  Rollins' legitimate goal of preventing sexual assault is *not* the issue in, nor

is it the basis for, this Complaint.  Rather, this Complaint addresses Rollins' unlawful

and/or gender biased treatment of innocent male students like John Doe via sexual

misconduct proceedings that afford females unconstitutional preferential treatment.

29.  Rollins' unlawful actions and/or gender-bias created a hostile environment

which in turn created an adverse educational setting in violation of Title IX, in part

because Rollins engages in sex stereotyping discrimination based on unlawful notions

of masculinity and femininity. This hostile environment causes innocent males on

Rollins' campus to be unlawfully disciplined and interferes with males' ability to

participate in or benefit from various activities including learning on campus.

30.  Although Rollins may allege its Policies are gender neutral, this is a pretext

for Rollins' anti-male discrimination implemented to subject innocent male students like

John Doe to sexual misconduct proceedings that afford females unlawful preferential

treatment.

31.   Altogether, the information detailed herein manifests Rollins' pattern and practice of: (a) providing preferential treatment to females – like Jane Doe - who allege they were sexually assaulted by male students; and (b) imposing presumptions against male students – like John Doe – who are falsely accused of sexual misconduct.   In addition, the allegations detailed above, and the allegations to follow specific to John Doe, demonstrate that Rollins was motivated by pro-female, anti-male bias that was, at least in part, adopted to refute criticism within the student body and public press that Rollins was turning a blind eye to female complaints of sexual assault.

***Agreements, Representations, Covenants & Warranties Between Plaintiff and Rollins***

32.   Prior to enrolling in Rollins, John Doe attended White Plains Senior High School in White Plains, New York.

33.   While a student at White Plains Senior High School, John Doe maintained a 4.2 GPA, played varsity ice hockey for four years, and played varsity lacrosse for three years. John Doe also played lacrosse for Superstars, a high school travel team. John Doe's goal was to play lacrosse in college on a scholarship.

34.   While John Doe was heavily recruited, Rollins was his eventual choice. This was a very important decision to John Doe as he had worked hard throughout high school to obtain an opportunity to play the sport he loved in college.

35.   Setting his sights on a leading liberal arts university with a strong lacrosse program, John Doe applied and was accepted to Rollins for admission to the Class of 2019. Rollins awarded John Doe an academic scholarship for $60,000.00.

36.   Upon his acceptance, Rollins provided John Doe with a copy of its school policy, the Rollins College Code of Community Standards (the "Code"), including

Rollins Sexual Misconduct and Harassment Policy (the "Policy") (collectively the "Code" and Policy" are referred to as the "Policies"), current copies of which are available on Rollins' website.

37. The Code states "Rollins College seeks to foster a safe environment conducive to learning and the free exchange of ideas. Rollins College does not discriminate on the basis of sex, disability, race, age, religion, color, national or ethnic origin, ancestry, marital status, veteran status, sexual orientation, gender identity, gender expression, genetic information, physical characteristics, or any other category protected by federal, state, or local law, in its educational programs, admissions policies, financial aid, employment, or other school-administered programs." Code, p. 6.

38. With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, Rollins' Policy provides as follows:

> Rollins College is committed to creating and maintaining a safe, healthy, and respectful community in which students, faculty, and staff can work together in an atmosphere free of all gender, sex, and sexual orientation discrimination. Sexual harassment, which includes sexual violence, is a form of sex discrimination. Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in any federally funded education program or activity.

> Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in any federally funded education program or activity. In response to this law, Rollins College has created The Office of the Title IX Coordinator. The Title IX coordinator leads Rollins' efforts to prevent and respond to sex and gender based discrimination.

> Any member of the Rollins community who is affected by sexual misconduct or violence is encouraged to immediately notify law enforcement and/or seek immediate medical attention. All individuals are encouraged to make a prompt report to the College so that the College can take appropriate action to eliminate the harassment, prevent its reoccurrence, and address its effects. Confidential support and assistance is also available on and off campus.

39.  The Dean of Students Office is responsible for resolving student conduct issues. The Code of Conduct provides the process by which students who have been accused of violating one or more of the enumerated sexual misconduct policies are investigated, heard and disciplined.

40.  All reports of incidents involving Sexual or Interpersonal Misconduct are referred to the Title IX Coordinator. As explained in the Policy:

> The College has a Title IX Coordinator and Deputy Title IX Coordinator to oversee its response to all reports of sexual misconduct and harassment, conduct training, and coordinate compliance with the mandates of Title IX.  The Title IX Coordinator and Deputy Title IX Coordinator are knowledgeable and trained in the College's policies and procedures, state and federal laws that apply to sexual misconduct and harassment, and the dynamics of sexual misconduct and harassment.  The Title IX Coordinator and Deputy Title IX Coordinator are available to meet with any individual to discuss the options for resolving a report under this policy.

41.  If a student discloses misconduct to another person, that person is "required" to elevate the report to the Title IX Coordinator or Deputy Title IX Coordinator.

42.  The Title IX Coordinator oversees the Dean of Student/Designee's investigation of any complaint of sexual misconduct against a student and will ensure complaints are appropriately processed under applicable University Policies and Procedures, as stated in the Code of Conduct.

43.  The Code states clearly that Rollins applies a "preponderance of the evidence" standard to violations of the Code. "The conduct educator's determination is made on the preponderance of presented evidence of whether it is more likely than not that the accused student violated College policy." Code, p. 20.

***The night of January 17 / morning of January 18, 2016; "The Incident"***

44. On the morning of January 17, 2016, at around 2:00 a.m. after a night of drinking, John Doe and his roommate, S.P., returned to their dorm room in Ward Hall, along with their friend and fellow Rollins student, A.S., and two others who do not attend Rollins.

45. As John Doe and the other four individuals sat in the dorm room, Complainant walked into the room at approximately 2:30 a.m. without invitation (the door had been unlocked). Complainant sat down on the futon and began to tell the individuals in the room about her first experience at a male strip club that evening and about pledge week. She continued to talk to everyone in the room about various topics.

46. At around 3:00 a.m., A.S. and the two other individuals, who did not attend Rollins, left to go to McKean Hall. Complainant, who lives in Ward Hall, decided to stay in John Doe's dorm room.

47. After approximately ten more minutes of conversation, Complainant, who was sitting beside John Doe on the futon, turned to John Doe and began to kiss him. John Doe returned the kiss. After about five minutes, Complainant pulled back and said "I don't think I should do this. I have a boyfriend." John Doe replied to her "Ok, that's fine. You can leave." Complainant stood up, walked to the door, stood there for a few moments, and then returned to the futon, straddled John Doe and began to kiss him again. A short while after she had reengaged kissing John Doe, Complainant stood up and made her way over to S.P.'s bed, where he was laying down, playing with his phone. She began to kiss him and they continued to kiss for approximately five minutes before she again pulled back and said "What am I doing? I have a boyfriend."

11

48.   John Doe and S.P. then offered to walk Complainant up to her room. The three of them got into the elevator, took the elevator up to the fourth floor, and proceeded with Complainant into her room for a moment. Complainant said good night to John Doe and S.P., and the two of them then left Complainant's room. John Doe and S.P. were in Complainant's room for no more than fifteen seconds, and nothing occurred while they were in the room.

49.   The next morning at around 11:30 a.m., John Doe and S.P. awoke to Complainant and her roommate, K.E., walking into the room. When Complainant and K.E. entered the room, Complainant was crying. The first thing that Complainant said was "Can we talk about what happened last night?"

50.   During the brief discussion between John Doe, S.P., Complainant, and K.E., Complainant acknowledged that she was also responsible for the events that transpired the previous night, namely that she cheated on her boyfriend by kissing John Doe and S.P.

51.   Once Complainant left the room, John Doe and S.P. told K.E. everything that they remembered from the previous night. Following this conversation, John Doe did not speak to Complainant again, since she seemed upset with her actions and the betrayal of her boyfriend.

52.   On or about January 19, 2016, Complainant contacted the Office of the Dean of Students, falsely reporting that John Doe and S.P. assaulted her in their dorm room. Both the Complainant and John Doe were given strict No-Contact Orders.

53.   Soon after being given the No-Contact Order, Complainant showed up to a party sponsored by Rollins' lacrosse team and the fraternity SAE, two organizations with

which John Doe and S.P. are affiliated. K.E. later told John Doe and S.P. that Complainant knew that John Doe and S.P. would be in attendance. Complainant was advised by K.E. not to attend because John Doe and S.P. would be there, but she decided to go to the party anyway.

54.  The next day, John Doe went to Defendant Jimenez's office to report that Complainant had attended a party thrown by John Doe's fraternity and lacrosse team knowing that John Doe would be there. Upon information and belief, no action was taken regarding this breach of the No-Contact Order.

**A.  <u>Rollins' Failure to Provide Proper Notice of the Charges</u>**

55.  On or about January 21, 2016, John Doe received a Notice of Investigation from Defendant Jimenez that stated a report of sexual assault had been alleged against John Doe.

56.  John Doe immediately sent emails, made phone calls and made visits to the office of Rollins' Title IX Coordinator to learn the details of the allegations. Defendant Jiménez did not respond for five days.

57.  On or about January 31, 2016, ten days after John Doe received the Notice of Investigation, and 24 hours before John Doe was to meet with the Investigator for his interview, he finally received a written list of the allegations against him.

58.  John Doe was stunned by the list of false allegations sent to him with only hours left to prepare a defense. He immediately went to the Title IX Coordinator's office where he was told by Defendant Jiménez to "dial it the fuck down."

59.  John Doe, after waiting ten days for some notice of the charges being brought against him, was blindsided and did not receive the impartial guidance expected from the

College's Title IX. Instead, Defendants Jimenez cursed John Doe and otherwise demonstrated bias and prejudgment against him.

60. Rollins' Policy guarantees: "The College provides resources to both the reporting party and responding party in making decisions, obtaining information about options under this policy, and assists both parties in the event that a report of sexual harassment or misconduct is made." However, John Doe received no resources for making decisions or obtaining information to prepare to defend himself against the false accusations made by the Complainant.

61. While the Rollins' Responding Party Bill of Rights promises a written notice of investigation and "the nature of the complaint filed" by Complainant, only the most general information was provided to John Doe, prohibiting him as the accused from fully understanding the "nature of the complaint."

62. Title IX guidance requires that both complainant and respondent have a right to "a balanced and fair process."  Notwithstanding that guidance, Rollins failed to provide John Doe with adequate notice of the charges against him in a timely manner in violation of Rollins' own policies as well as Title IX.  This stripped John Doe of his right to "a fair and impartial" investigation and hearing process.

**B.   Failure to Conduct a Thorough and Impartial Investigation**

63. Rollins conducted an investigation calculated to lead to the foregone conclusion that John Doe was guilty of the alleged misconduct. The investigation was replete with procedural errors including, but not limited to, the failure to properly investigate and collect all available evidence, the failure to include information provided by John Doe in the investigation report (the "Report"), the complete disregard of

contradictions and inconsistencies in the Complainant's statements when making assessments of credibility, and the improper exclusion of relevant information in the Report and resulting determination. Rollins' failure to adhere to proper investigatory protocol as required by Title IX and Rollins' own Policy resulted in a flawed investigation that led to a pre-determined, erroneous Decision.

### *The Investigator Lacked Proper Training*

64. Rollins' Procedure for Resolving Sexual Misconduct and Harassment Reports states that "the Title IX Investigator will conduct the investigation." Since all other individuals identified by title in the Procedures are employees of the college, this statement implies that the Title IX Investigator is an identifiable employee of Rollins. However, Rollins' Policies and Procedures provide no information identifying the Investigator, the selection process for appointing the Investigator, or the Investigator's qualifications and training, as required by the OCR's Dear Colleague Letter and the Clery Act.

65. Defendant Narducci, who was retained by Rollins' Title IX Investigator, conducted the investigation and interviews, published the Report and made the final Decision regarding the merits of Jane Doe's claims. A basic search of Defendant Narducci's background and of the Rollins website shows that Defendant Narducci never received specific training to conduct an investigation, publish a report, and make a final decision, as required by Title IX. In fact, there is no provision in the Policy ensuring that the Rollins' Title IX Investigator receives annual Title IX training as required by federal law, or even basic training as an investigator. Nor does Rollins have any quality

assurance that the Investigator was competent to conduct a Title IX sexual misconduct inquiry and make a determination of responsibility.

66. Defendant Narducci's (sometimes referred to herein as "Investigator") lack of proper training was apparent when she summarized witness interviews but did not verify the accuracy of her summaries with the interviewees; misreported the information of at least two witnesses who found erroneous information in their summaries; and submitted corrections with John Doe's appeal.

67. This single Investigator, who ultimately determined that John Doe was responsible for violating Rollins' Policies, had the discretion to decide the relevance of all proffered evidence and to determine what evidence to include or exclude in rendering her decision. This bias in the process made it possible for the Investigator to influence and even predetermine the outcome.

68. Title IX states, "[b]ecause laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience."

69. Defendant Narducci, who was contracted by Rollins as its Investigator, was required to be trained by Rollins annually in their specific Title IX policies, regardless of her previous experience independently as an investigator. There was no indication that Defendant Narducci had completed the necessary training to be charged with the responsibility to determine John Doe's outcome.

### *Witness Testimony Was Mischaracterized and Mishandled*

70.  The protocol attempted by Defendant Narducci lacked the requisite Title IX procedures right from the start, particularly in her treatment of witness testimony. During the preliminary meeting, John Doe was not asked to submit a list of witnesses for the Investigator to interview. The witnesses to be interviewed were determined solely by Defendant Narducci.

71.  Each of the witness interviews was summarized by Defendant Narducci, allowing her to exclude information that she determined irrelevant in her written summary. Importantly, the witnesses were not given the opportunity to review the Investigator's summaries of their testimonies in order to make corrections or clarifications to statements presented as fact in the final investigation Report.

72.  None of the witnesses, including the accused, were allowed to verify the accuracy of their testimony in the Report, calling into question the validity of the entire process and resulting Decision. For example, witness K.E. submitted a two-page statement with John Doe's appeal noting corrections and clarifications to her testimony that had been summarized by Defendant Narducci in the Report. K.E. stated that she had not seen the summary of her interview before the case was decided.

73.  Similarly, witness W.D. was not given an opportunity to review the Investigator's summary of his interview before the case was decided. W.D. has since seen the summary and believes the Investigator mischaracterized some of his statements to reflect poorly on John Doe.

74.  Further, with regard to witness testimony, the Investigator did not offer John Doe the opportunity to submit questions to be asked of Complainant and/or of any of the

witnesses. Title IX guidance directs schools "to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf."  Without being permitted to submit questions to the Investigator or to question his accuser at a hearing, John Doe was denied his basic rights to fundamental fairness and due process in responding to his accuser's allegations.

### *Improper Exclusion of Relevant Information.*

75. Rollins improperly excluded critical evidence favorable to John Doe in reaching its Decision, effectively directing the hearing board to reach the predetermined conclusion that John Doe was responsible for the misconduct alleged.

76. The Investigator never asked the Complainant how much she drank or what she drank, or over what period of time she drank. In fact, Rollins excluded information by the Complainant's own witnesses who specifically spoke to the fact that the Complainant was "not that drunk" and "not heavily intoxicated" as well as one of John Doe's witnesses who described Complainant as "coherent" and appearing "fine."

77. The Investigator found John Doe in violation of Rollins' Policies based upon the Complainant's state of "incapacitation," although it was never determined what alcohol or drug was used, how much was used, or over what period of time it was ingested, nor what evidence supported a determination of "incapacitation." The Investigator's reliance on the testimony of high school girls who thought the Complainant "didn't look like her Instagram" photos further evidenced the Investigator's lack of training and exclusion of relevant information necessary to determine incapacitation.

78. Further, although relevant, the Investigator excluded evidence that Complainant attended a lacrosse party the weekend following the Incident in violation of

the No-Contact Order which she had initiated. Both John Doe and S.P. were members of the lacrosse team and Complainant knew that they would be in attendance at the party.

### C. **Rollins' Bias Against the Male Accused**

***Rollins investigative process was biased against the male accused.***

79. Rollins' investigative process demonstrated a clear gender bias that resulted in a Decision and Sanction that did not afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard.

80. OCR requires that schools employ a preponderance of the evidence standard when evaluating allegations of sexual misconduct. Further, Rollins' own Policy states that determination of responsibility for all charges will be based on a preponderance of the evidence standard. Yet, Rollins demonstrated a presumption of guilt against John Doe as the male accused when it overlooked potentially exculpatory evidence, accepted Complainant's contradictory and inconsistent statements, and made baseless assessments of credibility.

81. For instance, Jane Doe filed a complaint with the Title IX Coordinator on January 19, 2016. Two days later, on January 21, 2016 at 11:00 p.m., Defendant DeCesare, Dispatch Officer in the Campus Safety Department, sent a notification to the campus community of a reported incident of "Sexual Assault – Non-Consensual Sexual Contact" and "Fondling." These classifications were from Title IX policy and were not reported crimes as required by the Clery Act. "Per the Clery Act, you must classify crimes based on the Federal Bureau of Investigation's (FBI's) Uniform Crime Reporting Handbook (UCR). For sex offenses only, use definitions from the FBI's National

Incident-Based Reporting System (NIBRS) edition of the UCR." U.S. Dept. of Education, *The 2011 Handbook for Campus Safety and Security Reporting* (pg. 34).

82.   The timely warning notification reported "non-consensual sexual contact that took place in Ward Hall during the early morning hours of Sunday, January17, 2016. The reporting student stated that they awoke to two other students engaging in sexual contact with them while they were incapacitated and unable to give consent to sexual activity."  This was more information, stated publicly, than was provided to John Doe in the Notice of Investigation sent to him by the Title IX Office on that very same day, January 21, 2016.

83. Defendant DeCesare, who has a degree focused on Domestic Violence, published an unsourced advisory about rape in the timely warning notification to the Rollins community stating that "Approximately 66% of rapes are committed by someone known to the victim." Defendant DeCesare thereby indicated that he had determined that the report of non-consensual sexual contact contained in the timely warning notification were allegations of rape against John Doe, although Defendant DeCesare had never investigated the report.

84.   This presumption of guilt of the male accused was perpetuated by Defendant Miller, Assistant Vice President of Public Safety, when he attended the initial meeting of John Doe with Defendant Jiménez and Defendant Weyant, Dean of Students, to discuss the Notice of Investigation (the "January 21st Meeting"). At the January 21st Meeting, before the Investigator had even interviewed the Complainant or John Doe, Defendant Miller repeatedly accused John Doe of committing rape. The interrogation of John Doe, during what should have been an informational meeting to explain the student conduct

process, demonstrated that Defendants had prejudged John Doe and presumed he was guilty before the investigation had even started.

***Defendants Refuse to Investigate John Doe's Complaint of Sexual Misconduct***

85.   Significantly, during the January 21ˢᵗ Meeting, John Doe stated that the Complainant had initiated all contact when she had climbed on top of him and kissed him without asking for his consent.

86.   When inquiring about submitting a complaint against the Complainant for her non-consensual sexual misconduct, Defendant Jiménez told John Doe that he should not make a report as it would only make him look guilty.

87.   Without an advisor present to offer him guidance, John Doe accepted the Title IX coordinator's recommendation. Defendant Jimenez's biased recommendation was based upon the assumption that an accused male must be guilty.

88.   Defendants Miller, Jimenez, and Weyant failed to inquire further into John Doe's complaint that Complainant had initiated non-consensual sexual conduct with him, and further failed to investigate the claim. Instead, they threatened John Doe to stay quiet about it, telling him it would affect the perception of his innocence. Defendants Miller, Jimenez and Weyant acted with bias, assuming that a male could not be the victim of non-consensual sexual conduct.

***The Investigator Failed to Use the Preponderance of the Evidence Standard***

89.   In order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred).  Thus, any conclusion reached by the Investigator must be supported by a preponderance of the evidence.

90.  Rollins' Policy fails to identify the applicable standard and fails to offer any guidance so that students may better understand how Rollins decides Title IX claims. John Doe was unaware of this standard or what it meant, thereby preventing him from defending himself fully.

91.  The Investigator failed to inform John Doe about the applicable standard of proof and whether that standard had been satisfied. Regardless, the Investigator's conclusion, by any evidentiary standard, was clearly erroneous and does not meet the preponderance of the evidence standard. Two esteemed Rollins' Wellness Center members expressed serious concerns about the integrity of the Investigator and the investigation, which calls into question the accuracy of the conclusion and sanctions invoked.

92.  The Investigator's findings that John Doe was responsible are completely negated by polygraph results conducted by a polygraph expert. The polygraph results indicate there is *insufficient proof* that it is more likely than not that John Doe is guilty of sexual assault.

### D. The Sanction Is Unwarranted And Disproportionate In Light Of The Circumstances

93.  According to the OCR, "Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member…may create a conflict of interest." However, Defendant Jiménez served as Title IX Coordinator in orchestrating John Doe's investigation and later as a disciplinary administrator by determining John Doe's Sanctions.

22

94.   In an April 7, 2016 letter to John Doe, Defendant Jimenez outlined the Decision and Sanctions imposed on John Doe. The Sanctions issued to John Doe included the following:

   a.   Suspension for the spring 2016 and fall 2016 semesters, which thus included a suspension for the semester John Doe had almost completed;

   b.   A no-contact order between John Doe and Complainant, to remain in effect for as long as Complainant is a student or employee at Rollins;

   c.   A notation of "suspension" on John Doe's transcript;

   d.   An immediate and permanent dismissal from John Doe's residence hall, without refund of residence hall costs;

   e.   Community Probation until John Doe's graduation;

   f.    Sexual harassment and misconduct education, which includes: (a) four online courses; (b) a meeting with the Title IX Coordinator upon John Doe's return to the College; and (c) a written paper to be completed upon John Doe's return to the College reflecting on the information learned from the online courses, the meeting with the Title IX Coordinator, and John Doe's actions; and

   g.   Meetings with a counselor for a minimum of one academic year after John Doe's return to Rollins, to be extended past one academic year at the counselor's discretion.

95.  The Sanctions assessed to John Doe were unduly harsh, arbitrary and severely disproportionate to the alleged misconduct. The magnitude and aggregate number of procedural errors and bias throughout the proceedings undermined John Doe's right to a fair process.

96.  It was not until John Doe made a request for information that he was informed that Complainant had submitted an appeal in response to the Decision and Sanctions.  Appeals would only be considered for procedural errors, new evidence or to object to the Sanctions.

97.  John Doe's request to read the Complainant's appeal was denied. Accordingly, he was denied his right to be informed of all the evidence presented against him and to respond to the new and/or additional information considered in the Complainant's appeal.

98.  On or about July 6, 2016, counsel for John Doe sent a formal request to Defendant Jimenez, asking for a copy of the Complainant's appeal. This request was ignored.

99.  Rollins' Policy does not provide the opportunity for a Responding party like John Doe, to submit an impact statement before Sanctions are assessed. Both Defendant Jimenez and Defendant Weyant had encouraged John Doe to continue with his academic courses and exams during the investigation and appeal. However, the Sanctions that were imposed retroactively included suspension for the Spring 2016 semester, which caused John Doe to lose the final grades and tuition for the 12 credits he had successfully completed. John Doe's cumulative grade point average at the end of his freshman year

was a 3.7 GPA.   The retroactive suspension and subsequent withdrawals assigned to those 12 credits for the Spring 2016 term caused John Doe's GPA to plummet.

100. John Doe was told, as stipulated by Rollins' Policy, that he would receive notification of the outcome of the investigation and decision via email simultaneously with Complainant.  However, inexplicably, as he stood outside the Title IX coordinator's office and with other students nearby, Ms. Jiménez verbally informed John Doe that he had been found responsible. This occurred on or about March 31, 2016.   The actual written notification, including a brief rationale and the Sanctions, was not delivered to John Doe until April 7, 2016.

## COUNT I

### Violation of Title IX of the Education Amendments of 1972
**(Against All Defendants)**

101. Plaintiff repeats and realleges the allegations contained in paragraphs 21-25, 28-31, 36-43, 54-100 as if fully set forth herein.

102. Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

103. Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX, even though there is very little direct federal funding of school sports.

104. Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be

25

prohibited by" Title IX or the regulations thereunder.   34 C.F.R. § 106.8(b) (Dep't of Educ.); 28 C.F.R. § 54.135(b) (Dep't of Justice).   Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

105. The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[3]

106. The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice…of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment…";

- "Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint…"[4]

107. Title IX also obligates schools to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[5]

108. Upon information and belief, Defendant Narducci did not have adequate Title IX training as required by Title IX.

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn. 98-101.
[3] *Id.* at 22.
[4] *Id.* at 20.
[5] *Id.* at 21.

109. Defendants also failed and/or refused to follow Rollins' existing Policies and Procedures when investigating the charges against Plaintiff. Specifically, Defendants failed to investigate John Doe's own complaint of sexual assault against Jane Doe.

110. Rollins' existing Policies and Procedures discriminate, on the basis of sex, against accused males, including Plaintiff. Rollins conducted its investigation of the allegations against Plaintiff in a manner that was biased in favor of the female accuser. In fact, Rollins refused to investigate or move forward on John Doe's complaint that he was sexually assaulted by Complainant.

111. Rollins failed to provide Plaintiff an adequate opportunity to review and contest the specific allegations against him, failed to conduct a fair and equitable investigation, and failed to conduct a hearing. From the moment that Complainant filed her claim, Rollins pre-judged John Doe as "guilty," and treated him accordingly.

112. Rollins' Policies effectuate a denial of due process for the student population, especially the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

113. Rollins' Policies and Procedures disproportionately affect the male population of Rollin's community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

114. Rollins has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted under the cloud of a presumption of guilt. This one-sided process deprived Plaintiff, as a male student, of educational opportunities at Rollins on the basis of his sex.

27

115. Rollins imposed Sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in non-consensual sexual conduct with Complainant.   As a result, Plaintiff faces a permanent notation on his Rollins transcript labeling him a sexual predator, even though he was never given an opportunity for a hearing.

116. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## Violation of the Fourteenth Amendment of the United States Constitution
## Procedural Due Process
### (Against Defendant Rollins)

117. Plaintiff repeats and realleges the allegations contained in paragraphs 16-31, 36-43 and 54-100 as if fully set forth herein.

118. On April 4, 2011, the United States, by and through its agent, the DOE, sent a 19-page "Dear Colleague Letter" to colleges and universities throughout the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX."

119. Reversing previous federal policy, the Dear Colleague Letter threatened colleges and universities with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

120. As a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges and universities were required to:

- Investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

- Establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

- Protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

- Apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges and universities frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

- Prohibit accused students from cross-examining witnesses; and

- Expel students found to have engaged in nonconsensual sexual intercourse with other students.

121. Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, DOE Assistant Secretary for Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.

122. Upon information and belief, Rollins acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to substantial, indeed crippling, monetary penalties.

123. Accordingly, Rollins was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

124. Rollins applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the complaint against Plaintiff.

125. Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

126. When Rollins investigated and adjudicated the complaint made by Complainant against Plaintiff, and when it sanctioned Plaintiff, Rollins was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

127. In the course of Rollins' investigation and adjudication, Rollins flagrantly violated Plaintiff's clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

128. Based on the foregoing, Rollins was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the sexual assault complaints against Plaintiff.

129. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III
## Breach of Contract
### (Against Defendant Rollins)

130. Plaintiff repeats and realleges the allegations contained in paragraphs 32-43, and 54-100 as if fully set forth herein.

131. Based on the aforementioned facts and circumstances, Rollins created express and implied contracts when Plaintiff accepted an offer of admission to Rollins and paid tuition and fees.

132. Based on the foregoing facts and circumstances, Rollins breached express and implied agreement(s) with Plaintiff.

133. Rollins committed several breaches of its agreements with Plaintiff during the investigation process, by: failing to conduct an equitable investigation of Complainant's claims; failing to conduct an equitable investigation of Plaintiff's claims; discriminating against Plaintiff on the basis of sex; and failing to apply the proper burden of proof.

134. As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, financial injuries, and other direct and consequential damages.

135. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
## Breach of the Covenant of Good Faith and Fair Dealing
### (Against Defendant Rollins)

136. Plaintiff repeats and realleges the allegations contained in paragraphs 32-43, and 54-100 as if fully set forth herein.

137. Based on the aforementioned facts and circumstances, Rollins acted in bad faith when it meted our disproportionate Sanctions notwithstanding the flawed investigative process and lack of evidence in support of Complainant's allegations of sexual misconduct.

138. Based on the aforementioned facts and circumstances, Rollins breached and violated a covenant of good faith and fair dealing implied in the agreements with Plaintiff.

139. As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

140. Plaintiff is entitled to recover damages for Rollins' breach of the express and/or implied contractual obligations described above.

## COUNT V
## Negligent Infliction of Emotional Distress
### (Against All Defendants)

141. Plaintiff repeats and realleges the allegations contained in paragraphs 32-43, and 54-100 as if fully set forth herein.

142. Defendants owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner.

143. Defendants breached their duties owed to John Doe.

144. Such breaches created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

145. As a direct and foreseeable consequence of Defendants' actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

146. The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe. John Doe now suffers from an inability to focus independently, increased anxiety, depression, paranoia, and extreme insomnia. While at Rollins and going through the situation described above, John Doe had such frequent meetings with his counselor that she expressed extreme concern for his well-being.

147. Defendants' extreme and outrageous conduct was the cause of John Doe's distress.

148. Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, Defendants should have recognized that their conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

149. John Doe's distress is reasonable in light of Defendants' conduct.

150. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT VI
### Estoppel and Reliance
### (Against Defendant Rollins)

151. Plaintiff repeats and realleges the allegations contained in paragraphs 32-43, and 54-100 as if fully set forth herein.

152. Rollins' various Policies constitute representations and promises that Rollins should have reasonably expected to induce action or forbearance by Plaintiff.

153. Rollins expected or should have reasonably expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that Rollins would not tolerate, and Plaintiff would not suffer, harassment by fellow students, and would not deny Plaintiff his procedural rights should he be accused of a violation of Rollins' Policies.

154. Plaintiff relied to his detriment on these express and implied promises and representations made by Rollins.

155. Based on the foregoing, Rollins is liable to Plaintiff based on estoppel.

156. As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, and other direct and consequential damages.

157. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT VII
### Declaratory Judgment
### (Against Defendants Rollins, Narducci, and Jimenez)

158. Plaintiff repeats and realleges the allegations contained in paragraphs 32-43, and 54-100 as if fully set forth herein.

159. Rollins, Narducci, and Jiminez committed numerous violations of the Parties' contracts and of federal and state law.

160. Plaintiff's future has been severely compromised and damaged. Without appropriate redress, the Sanctions imposed as a result of Defendants' biased investigation will continue to cause irreversible damage to Plaintiff's educational, career, and future employment prospects.

161. As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency and future handling of Plaintiff's formal student record at Rollins.

162. By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Defendant Narducci and Defendant Jimenez be reversed; (ii) the Sanctions be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's suspension be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Rollins' Code is unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

(i)    on the first count for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)    on the second count for violation of the Fourteenth Amendment of the United States Constitution, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)    on the third count for breach of contract, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)    on the fourth count for breach of the covenant of good faith and fair dealing, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(v)    on the fifth count for negligent infliction of emotional distress, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vi)    on the sixth count for estoppel and reliance, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Rollins, impact

on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vii)     on the seventh count for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that (i) the outcome and findings made by Defendant Narducci and Defendant Jimenez be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's suspension be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Rollins' Code is unconstitutional as applied.

## Jury Demand

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:   **New York, New York**
**January 20, 2017**

                                   **Respectfully submitted,**

                                   **NESENOFF & MILTENBERG, LLP**
                                   ***Attorneys for Plaintiff John Doe***

                    **By:**    **/s/ Andrew Miltenberg_____**
                                   **Andrew T. Miltenberg, Esq.**
                                   **NY Bar # 2399582**
                                   **/s/ Diana Warshow Zborovsky_**
                                   **Diana R. Warshow, Esq.**
                                   **NY Bar #4751145**
                                   **NESENOFF & MILTENBERG, LLP**
                                   **363 Seventh Avenue, Fifth Floor**
                                   **New York, New York 10001**
                                   **Telephone: 212-736-4500**
                                   **Facsimile: 212-736-2260**
                                   **Email  amiltenberg@nmllplaw.com**
                                   **Email: dwarshow@nmllplaw.com**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on January 20, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Fritz Scheller
**FRITZ J. SCHELLER**
**Florida Bar Number 183113**
**Fritz Scheller, P.L.**
**200 East Robinson St., Suite 1150**
**Orlando, Florida 32801**
**Telephone: 407-792-1285**
**Facsimile: 407-513-4146**
**Email: fscheller@flusalaw.com**
*Local Counsel*